# Kentucky-West Virginia Gas Co. v. Jayne.

Jan. 20, 1942.

Combs & Combs for appellant.

Wheeler & Wheeler for appellee.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming in part and reversing in part.

The Kentucky-West Virginia Gas Company and Ernest Jayne entered into a contract in February, 1928, under which the Company agreed to purchase all of the gas produced by Jayne from a tract of land owned by him at the rate of ten cents per thousand cubic feet. Jayne drilled two wells on his property and the Company gathered his gas, as well as that from certain wells owned

by it and other wells in the Flat Gap field in Johnson County, into its lines and forced it into a high pressure line of the Kentucky Pine Line Company by means of a compressor station. The Pipe Line Company paid the Kentucky-West Virginia Company twenty cents per thousand cubic feet for the gas. In 1928, the Company was delivering approximately 900,000 cubic feet a day to the Pipe Line Company. By the latter part of September, 1932, the average daily delivery was 190,000 cubic feet. On September 27, 1932, the Company abandoned the field in which these wells were located and moved its compressor station. It plugged up its four wells, but arranged for Jayne's gas to be sold through the line of the Central Kentucky Company in the Red Bush field until May, 1933, when that Company closed down. The Central Kentucky Company operated its station from October, 1936, to November, 1937, for the purpose of taking gas from its own wells and then dismantled its compressor station and sold its wells in the Red Bush field to the Ashland Refining Company. The latter Company pays six cents per thousand cubic feet for gas. It does not market the gas, but uses it to re-pressure its oil wells in a nearby field.

Jayne contacted the Company in May, 1936, with the view, as he testified, of getting it to cancel his contract in order that he might sell his gas to another concern. Correspondence between the parties after that time until a release was signed by the Company on April 21, 1937, indicates that the parties could not agree upon the terms of the release. Jayne said that he was unwilling to sign an agreement releasing the Company from any obligations under the contract, as it insisted.

Jayne instituted this proceeding in April, 1938, to recover the sum of $3,000 for gas which he alleged he could have produced under the contract. The trial resulted in a judgment in his favor in the amount of $1,246.66, based upon the report of a special commissioner. The basis of the finding is that, at the time the Company ceased taking Jayne's gas in 1933, his two wells were producing about one million cubic feet of gas per month; that Jayne demanded surrender of the lease in May, 1936, but that the Company refused to cancel or return it until April, 1937; that the proof shows that he could have marketed his gas at ten cents per thousand cubic feet to another Company during that time; that he

was entitled to the sum of $100 per month for the 11 months (from May, 1936, to April, 1937, calculated on the basis of ten cents per thousand for one million cubic feet of gas per month), making a total of $1,100; that on January 1, 1938, Jayne sold his gas to the Ashland Company for six cents per thousand cubic feet; and that he should be allowed the further sum of $146.66, representing the difference between ten cents per thousand cubic feet and six cents per thousand cubic feet for a million cubic feet of gas for three months and twenty days, the period between January 1, 1938, and the date this action was filed.

In urging reversal the Company stresses paragraphs 3 and 17 of the contract. They are as follows:

"Third: The Company has bought and hereby agrees to take and pay for all the natural gas produced from the hereinbefore described land and agrees to receive said gas in the usual conduct of its business, ratably with gas taken by the Company from wells in the immediate vicinity of substantially the same rock pressure, and in accordance with approved practice of the industry, but shall not be required to take gas when same can not be delivered in commercial quantities and at sufficient pressure to enter its lines against the varied working pressures therein, nor to continue connection with any well after the same shall become unprofitable."

"Seventeenth: This Contract is made subject to all causes, interferences, accidents and occurrences beyond the reasonable control of the parties, and neither party shall be answerable to the other for loss or damage so occasioned."

Considerable proof was advanced by the Company as to the markets for gas around 1932 and 1933, and as to the rock pressure of the wells in the Flat Gap field at that time. The reason given for closing down its operations in that field in 1932 was that it could not afford to deliver the reduced amount of gas to the Pipe Line Company for twenty cents a thousand cubic feet. There is also the contention that the picture presented by the Company as to the general conditions in the field and the market for gas around 1932 and 1933 was such that its contract with Jayne automatically terminated. There is proof that it would have been unprofitable for the Com-

pany to have taken only the gas from Jayne's wells, which were still producing gas in paying quantities when viewed in terms of the conditions under which the Company first began to take gas from them. It must not be overlooked that from the very beginning of the time when the Company began to take Jayne's gas it was necessary that it force it by means of a compressor station into the lines of the Pipe Line Company; but we have noted that Jayne was not allowed to recover damages from the time the Company ceased to take his gas sometime in 1933 until April, 1936. This, in effect, was a recognition on the part of the chancellor that the Company was justified in suspending operations during that period, and Jayne is not appealing from that ruling.

While we have noted the contention is made that the contract was cancelled automatically by virtue of the foregoing conditions, in view of the two provisions heretofore quoted, it is significant that the Company refused to surrender the contract to Jayne when he first asked that this be done in April, 1936, as he testified. We think the record shows conclusively that between the time Jayne said he first contacted the Company as to the cancellation of the contract until the formal release was given to him in April, 1937, the Company manifested an unwillingness to make an outright release and surrender of the contract. We have noted that there was some activity in the gas fields around 1936, and it is obvious to us that the Company desired to hold on to Jayne's contract. True it is that testimony was offered by the appellant to the effect that Jayne had been told in 1933 that he could sell his gas in the Flat Gap neighborhood, and there is a letter from an officer of the Company dated October 26, 1936, to the effect that the Company was not obligated to take gas after the line pressure exceeded the rock pressure of the wells and it had become unprofitable to receive Jayne's gas, and wherein it was suggested that he might be able to sell his gas to another company; but, notwithstanding this, the contract was not surrendered or released. Furthermore, we have viewed the contract as a whole, as is our rule, Veech v. Deposit Bank of Shelbyville, 278 Ky. 542, 128 S. W. (2d) 907, and have reached the conclusion that it does not lend itself to the interpretation made by the Company as to the question of automatic cancellation. We think, therefore, that the record supports a finding in favor of Jayne from the

time he first demanded a surrender of the contract until it was released (May, 1936, to April, 1937).

We think also that the measure of damages applied for that period was correct. There is testimony that Jayne's wells were producing about a million cubic feet of gas per month when operations closed down about 1933, and when the Ashland Company began to take his gas in January, 1938, the wells were producing about the same amount. There is Jayne's testimony that he could have sold his gas during the period for which damages were allowed him if he had been able to get a release from his contract, and, of course, there is testimony for the Company to the opposite effect. We are not disposed to disturb the finding of the chancellor on this point.

The point is made that the contract was rescinded by mutual agreement, and the release signed only by the Company so states without a reservation contained therein in favor of Jayne; and since he elected a rescission of the contract, and it was rescinded, he can not thereafter maintain an action for damages for a breach of the contract. We think, however, that the effect of the release was prospective rather than retroactive, because Jayne clearly made out a case for damages during the period he was attempting to get the Company to surrender the contract. The story would have been a different one if the Company had released the contract when Jayne first raised the question.

We find no basis whatever for the additional award of $146.66 for the difference between the amount paid by the Ashland Company for Jayne's gas after January 1, 1938, and the amount the Kentucky-West Virginia Company had agreed to pay for it. As we have noted, the contract was formally rescinded in April, 1937. It is obvious that there was no basis for damages after that date.

It follows from what has been said that the judgment must be and it is reversed, with directions that it be set aside and for the entry of a judgment in favor of Jayne for the sum of $1,100, plus interest from April 20, 1938.